# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-00794-SCT

*JOEL SCOTT SPIRES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2008 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: JUSTIN TAYLOR COOK |
| | LESLIE S. LEE |
| | GLENN F. RISHEL |
| | LISA COLLUMS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/04/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., DICKINSON AND PIERCE, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.    In this capital-murder case, the defendant was convicted and sentenced to life in prison without the possibility of parole. He appeals to this Court, asserting that the trial court erred by improperly dismissing a juror, and by refusing to give a "stand-your-ground" jury instruction. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Joel Scott Spires was indicted by a Harrison County grand jury for the capital murder of Rodney Wade Saucier, and for the underlying crime of robbery.[1] At trial, the State presented several witnesses who testified that Spires had confessed to killing Saucier. Cedric Page, an acquaintance of Spires, testified that, on the night of December 25, 2005, Spires came to his trailer and attempted to sell him a Cadillac. After Page inquired further about the Cadillac, Spires told him that he had been in a confrontation with the owner, and that the owner had kicked his teeth out. Page testified that he thought Spires was joking, so he asked Spires to open his mouth. When Spires opened his mouth and revealed that some of his teeth were, indeed, knocked out, Page realized he was not joking.

¶3. Page testified that Spires then "broke down and told me he ended up doing what he [had] to do," and that he had stabbed the owner of the Cadillac. After Spires told him about the stabbing, Page decided not to purchase the Cadillac and told Spires to leave with the Cadillac and get rid of it. Page testified that he did not call the police, however, because he "ain't too much take it too serious or nothing like that," because he had smelled alcohol on Spires's breath.

¶4. Denita Fairconeture, Page's fiancé, testified that she had arrived at the trailer she shared with Page around 11:00 p.m. the night of December 25, 2005. When she pulled into the driveway, she noticed a burgundy Cadillac outside that she did not recognize. She went into the trailer and observed Spires attempting to sell Page the Cadillac. She testified that

---

[1]The indictment also noted that Spires was a habitual offender, pursuant to Mississippi Code Section 99-19-81, and was eligible to be sentenced as such. Spires previously had been convicted of five felonies, including aggravated assault of a peace officer.

Spires's knuckles were bloody, and that some of his front teeth were missing. Spires mentioned that he had been in a fight over drugs, and that he had killed somebody. Fairconeture also testified that she and Page thought Spires was joking at the time.

¶5. Alphonse Dedeaux, Spires's roommate, testified that he had last seen Spires about 10:00 or 11:00 p.m. on Christmas night, and that Spires had returned to their trailer around 5:00 or 6:00 the next morning. When Dedeaux noticed that Spires was missing his front teeth, Spires told him that he and Saucier had gotten into a fight and that he had killed Saucier. Dedeaux then told Spires that "he had to go," and Spires moved out of the trailer a couple of weeks later.

¶6. At some point not entirely clear from the record, Page observed the police pulling the Cadillac out of some woods down the road from his trailer. Page testified that, when he saw the Cadillac, he realized that Spires had not been joking, and he decided that he and Fairconeture should contact the police.[2]

¶7. Kenny Ladner testified that he, along with his wife and friends, were hunting on December 27, 2005, when they discovered a body, which was later identified as Saucier's. They contacted the police and stayed near the body until the police arrived.

¶8. Nancy Kurowski, a Harrison County evidence and crime-scene technician, testified that she had arrived at the location of the body to process the crime scene. She had observed the body lying facedown in some tall weeds. She testified that no weapons or vehicles were present at the scene. Kurowski testified that she later processed the Cadillac and found no

---

[2]Page's testimony revealed that he went to the police in hopes of negotiating a deal on some pending drug charges.

weapon, but that what appeared to be blood was on the driver's headrest, in the rear passenger area, and on the exterior of the passenger door. Also present in the Cadillac were a number of beer bottles and what appeared to be a controlled substance.

¶9.   Dr. Paul McGarry, the forensic pathologist who performed the autopsy, testified that he had found forty-nine stab wounds on Saucier's body. The stab wounds ranged from the top of Saucier's head to his lower extremities. Some of the stab wounds had pierced the skull, lungs, heart and aorta, causing massive internal bleeding. The deepest stab wound was six and one-eighth inches deep. The wounds were located predominately on the left side of Saucier's body and were in different directions, with no repeating pattern. Dr. McGarry also testified that the location of the wounds was consistent with two people being very close together, and probably moving.

¶10.   The State's final witness, investigator Joey Tracy, testified that he had arrived at the crime scene around 3:30 p.m. on December 27. He noticed that the victim's left jacket pocket was pulled out, as though someone had gone through it. He also found a crack pipe in that pocket. The body was not identified at the scene.

¶11.   Tracy testified that, when the Cadillac was recovered, officers ran the tag and discovered that it belonged to Clifton Saucier. Investigators spoke to Clifton Saucier, who confirmed that he owned the Cadillac, but that his son Rodney actually used it. Investigators subsequently were able to identify the body as Rodney Saucier's.

¶12.   After Page and Fairconeture came forward, Tracy focused the investigation on Spires. Investigators went to Dedeaux's house in an attempt to locate Spires, but were unsuccessful. Unable to locate Spires anywhere in Harrison County, investigators registered a warrant with

4

the National Crime Information Center. On January 12, 2006, Tracy was notified that Spires had been arrested in Texas. Spires waived extradition, and Tracy and another investigator traveled to Texas and picked him up. Spires subsequently was indicted by a Harrison County grand jury for the capital murder of Rodney Wade Saucier, with the underlying crime of robbery. The State rested after Tracy's testimony, and Spires moved for a directed verdict, which the trial court denied.

¶13. Spires took the stand in his own defense. He testified that Saucier had picked him up in the Cadillac and asked him to go to the Broke Spoke bar with him, because somebody had given Saucier a black eye there earlier. However, Saucier proceeded to pull the Cadillac into a field along the way, stating that he "really just wanted to get away from there because he wanted somebody to get high with." Saucier started smoking crack, and Spires joined him. Saucier started "tripping on his dope" and began rummaging around the glove compartment and the trunk. Spires suggested that they move the car further into the field, so as not to attract attention. Saucier agreed, and Spires moved the car further into the field, laying the keys in the floorboard afterwards.

¶14. Spires testified that Saucier began rummaging through the car again and began "cussing and griping about something." When he asked Saucier what was wrong, Saucier replied: "[You] should know what's wrong." Saucier approached Spires in a "mad rage" and accused Spires of taking his money. When Spires denied taking the money, Saucier began poking Spires in the chest with his finger. Saucier continued to accuse Spires of taking his money, and Spires testified that he "unzipped [his] jacket," because he "thought [they] was going to fight."

5

¶15. Spires testified that Saucier pushed him and, as Spiers was going down, he grabbed Saucier, and both men went down. They were rolling around on the ground, fighting, when Spires felt Saucier snatch something from his side. Spires knew that it was his knife that Saucier had snatched. Spires testified that he could hardly see Saucier because it was dark, but that Saucier had said "I want to stab you in the face . . . ." As Spires started to get up, Saucier pushed him and kicked him the face, knocking Spires's two front teeth back into the roof of his mouth. Spires had dirt in his eyes and ears, but he tried to get up quickly, because Saucier was approaching him again with the knife. Spires was able to twist the knife out of Saucier's hand, but Saucier continued hitting Spires, so Spires stabbed him in the left shoulder. They continued to struggle, falling down and tussling on the ground. Spires testified that Saucier would not let go of his shirt, but that he was finally able to pry him off. When Spires got up, Saucier was still lying on the ground, not moving.

¶16. Spires walked to the Cadillac and "propped [his] hands up." When he realized that Saucier was still lying on the ground, he began cursing at him. He told Saucier to "get up if he [wanted] some more" and kicked him in the leg. When Saucier still did not move, Spires picked up his leg and jerked him, trying to get him to get up. Saucier's shoe came off in his hand, and Spires threw it at him. He went back to the Cadillac, retrieved a flashlight, and threw that at Spires. When Saucier still did not get up, Spires planned to pick him up and put him in the Cadillac. When he picked up Saucier's body, however, he "realized then that [he had] killed him."

¶17. Spires testified that, after he realized Saucier was dead, he sat down in the driver's seat of the Cadillac. He was " shaking so bad" that he couldn't stay still or sit straight. After

6

feeling something in his mouth, he turned on the viser light and realized that his front teeth had been knocked back into his mouth, so he pulled them out and placed them in the cup holder. He "frisked [Saucier] down" for the Cadillac keys, but did not find them. He went back to the car and realized that he had left the keys in the floorboard. He backed the car up and turned the headlights onto Saucier's motionless body. He testified that he "knew he had to go get some help. . . . I had to tell somebody about it . . . . I don't know . . . I lost it." He took the Cadillac and drove to Cedric Page's trailer.

¶18. After attempting to sell Page the Cadillac, Spires left and drove to Dedeaux's trailer. While there, Matthew Dedeaux asked him for a ride home. Matthew asked Spires what he was going to do with the Cadillac, and Spires answered that he was "going to park [it] in a church parking lot or somewhere." Matthew then offered a suggestion as to where Spires should park the Cadillac. After taking Matthew home, Spires parked the Cadillac in the place Matthew had suggested and then walked back to Alphonse Dedeaux's trailer. He took a shower and burned his clothes. Spires eventually packed his clothes and hitchhiked to Texas. After being arrested in Texas, he admitted to Harrison County investigators that he had killed Saucier. He testified that he had not notified the police earlier because he was afraid that the people with whom he was living would have "killed him" for bringing the police to their trailers.

¶19. At the completion of Spires's testimony, the defense called two more witnesses, and then rested. Both parties stipulated that, if the Harrison County coroner had been called to testify, he would have testified that Saucier had tested positively for cocaine and alcohol at the time of his death. Spires moved the court to grant a peremptory instruction finding him

not guilty of capital murder, which the trial court refused. After deliberation, the jury found Spires guilty of capital murder. The jury was unable to agree unanimously to impose the death penalty, so the trial judge sentenced Spires to life in prison, without the possibility of parole. The trial court denied Spires's motion for a new trial and for acquittal notwithstanding the verdict, and Spires appealed to this Court. On appeal, Spires claims that the trial court erred when it dismissed a potential juror because she had served on a jury in a criminal trial within the past two years, and that he was denied his fundamental right to a fair trial when the trial court refused his "stand-your-ground" jury instruction.

## I.

¶20. Spires claims that the trial judge erred by disqualifying a potential juror because she had served on a jury in a criminal trial within the past two years. During the court's voir dire, the following exchange transpired:

> COURT: There are certain qualifications that a person must possess in order to serve on a jury. These qualifications are mandated by the Mississippi Legislature and by the law of Mississippi. I'm going to go over those with you at this time . . . .
>
> . . . .
>
> COURT: [The next qualification is that you] may not have served on a jury in the last two years in this court that heard a case and actually went to a decision. Has anybody been a juror in this Court in the last two years? Yes, ma'am.
> POTENTIAL JUROR: In October of 2006 I was on the jury.
> COURT: And did the jury reach a verdict in the case you sat in?
> POTENTIAL JUROR: Yes, sir.
> COURT: All right. Ma'am, you may be excused[3] . . . .

---

[3]In a different context, the phrase "you may be excused" could suggest that a juror has a choice of whether to serve. However, in this case, the trial judge's preceding statements clearly indicate that the trial judge had disqualified the juror.

8

¶21.    Mississippi Code Section 13-5-25 establishes exemptions from jury service based

upon personal privilege:

> Every citizen over sixty-five (65) years of age, and everyone who has served as a grand juror or as a petit juror in the trial of a litigated case within two (2) years, shall be exempt from service *if the juror claims the privilege*. No qualified juror shall be excluded because of any such reasons, but the same *shall be a personal privilege to be claimed by any person selected* for jury duty. Any citizen over sixty-five (65) years of age may claim this personal privilege outside of open court by providing the clerk of court with information that allows the clerk to determine the validity of the claim.

Miss. Code Ann. § 13-5-25 (Rev. 2002) (emphasis added).[4]  In ***Davis v. State***, 767 So. 2d 986

(Miss. 2000), this Court held that these statutory exemptions "are not mandatory and must

be asserted by the individual." ***Id***. at 1000.

¶22.    In ***Adams v. State***, 537 So. 2d 891 (Miss. 1989), a deputy circuit clerk unilaterally

struck from the jury list persons over sixty-five years of age and persons who had served on

a jury in the past two years.  Referring to Section 13-5-25, this Court stated:

> The statute makes clear that neither the circuit court – and certainly not the deputy circuit clerk – have authority to act unilaterally and strike from the jury list persons over sixty-five and who have served within the past two years. [footnote omitted].  Such persons are eligible for jury service and have every lawful right and authority to serve if called and selected. When their names are drawn, such persons must be summoned the same as other prospective jurors. Even then no one has authority to exempt any such juror from service unless he or she claims the privilege and asks to be excused.

***Adams***, 537 So. 2d. at 894.

---

[4]Mississippi Code Section 13-5-1, which establishes competency to serve as a juror, states in pertinent part that "no talesman or tales juror shall be qualified who has served as such talesman or tales juror in the last preceding two years, and no juror shall serve on any jury who has served as such for the last preceding two years."  Miss. Code Ann. § 13-5-1 (Rev. 2002).  This language applies only to the outdated practice of using tales jurors for circuit court juries.

¶23. In the case before us today, it is clear from the trial transcript that the potential juror did not assert her personal privilege to be excluded from jury duty. Thus, we find that the trial judge erred by preemptively dismissing her from the jury pool. Nevertheless, Spires is not entitled to relief on this basis for two reasons.

*Procedural Bar*

¶24. It is clear from the record – and Spires concedes – that he did not object when the trial judge dismissed the potential juror at issue, nor did he object to the jury's final composition. A contemporaneous objection would have cleared up any question as to the trial court's use of the phrase "you may be excused." Furthermore, this Court has stated on many occasions that a party who fails to object contemporaneously to a jury's composition may not raise that issue on appeal. For example, in *Myers v. State*, 565 So. 2d 554 (Miss. 1990), this Court stated that "a party who fails to object contemporaneously to the jury's composition before it is empaneled waives any right to complain thereafter." *Id.* at 557. Thus, Spires's claim that the trial court erred in preemptively dismissing the potential juror is procedurally barred.

*Harmless Error*

¶25. Procedural bar notwithstanding, we find that the dismissal was harmless error. Spires makes no claim of a constitutional violation, and he presents absolutely no evidence that he was prejudiced in any way by the judge's dismissal of the potential juror. Moreover, this Court recently has held that a trial judge will not be held in error when an appellant simply offers a conclusory statement that the trial court erred. *See Archer v. State*, 986 So. 2d 951, 957 (Miss. 2008) ("In his appeal, the defendant offers nothing more than a conclusive assertion that the trial court erred by denying his challenge for cause as to juror number 11,

10

based on her disclosure that she casually knew the victim in this case from having seen him in the community. This is not enough to place the trial court in error."). We find that Spires's claim that the trial court erred in dismissing a potential juror is without merit.

**II.**

¶26. Spires also argues that the trial judge erred when he refused Spires's "stand-your-ground" jury instruction. Specifically, Spires claims that "it is more than reasonable to believe that a juror may have thought that the actions taken by [him], be they self-defense or imperfect self-defense, were, as a whole, unreasonable because [he] did not flee his attacker."

¶27. "[E]very accused has a fundamental right to have her theory of the case presented to a jury, even if the evidence is minimal." *Chinn v. State*, 958 So. 2d 1223, 1225 (Miss. 2007). We have held that "[i]t is, of course, an absolute right of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court. This Court will never permit an accused to be denied this fundamental right." *Id*.

¶28. "A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991) (internal citations omitted). "A trial court is not required to give instructions which are covered by other instructions although the language may differ." *Davis v. State*, 431 So. 2d 468, 475 (Miss. 1983) (citation omitted).

¶29. We find that Spires's claim that he was denied his right to a fair trial when the trial court refused his "stand-your-ground" must fail, because his proffered jury instruction was covered fairly elsewhere in the instructions, and because there was no factual basis to support it.

*Covered Fairly Elsewhere*

¶30. Spires's proffered jury instruction stated:

> The Court instructs the jury that a person claiming the right of self-defense is not required to retreat or to consider whether he could safely retreat. If he is honestly and reasonably in fear of death or serious bodily harm he may stand his ground and use whatever force necessary under the circumstances, even to the extent of taking the life of the attacker.

We hold that, although no other jury instruction specifically used the words "stand your ground," they certainly "fairly covered" Spires's right to self-defense.

¶31. Instruction S-101 stated:

> The Court instructs the Jury that to make a killing justifiable on the grounds of self-defense, the danger to the Defendant must be either actual, present and urgent, or the Defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the ground upon which the Defendant acts.

¶32. Instruction S-102A stated:

> The Court instructs the Jury that a person may not use more force than reasonably appears necessary to save his life or protect himself from great bodily harm. The question of whether he was justified in using the weapon is for determination by the jury.
>
> The law tolerates no justification and accepts no excuse for an assault with a deadly weapon on a plea of self-defense except when the assault by the Defendant on the victim was necessary or apparently so to protect the Defendant's own life or his person from great bodily injury and there was

12

imminent danger of such design being accomplished. The danger to life or of great personal injury must be or reasonably appear to be imminent and present at the time the Defendant commits the assault with a deadly weapon. The term "apparent" as used in "apparent danger" means such overt, actual demonstration by conduct and acts of a design to take life or do some great personal injury as would make the Capital Murder apparently necessary to self preservation or to escape great bodily harm.

¶33.   Instruction D-6A stated:

The Court instructs the jury that every killing of a human being is not a crime, and that it is not incumbent upon the Defendant, Joel Scott Spires, to prove conclusively that he acted in self-defense. All that is necessary for the Defendant, Joel Scott Spires, to prove in order to establish self-defense, is that at the time of death of Rodney Wade Saucier, the Defendant, Joel Scott Spires, had reasonable grounds to apprehend danger to his life or great bodily harm on account of the actions of Rodney Wade Saucier and if you, the jury find that the Defendant, Joel Scott Spires, had reasonable grounds to apprehend danger to his life or great bodily harm on account of the actions of Rodney Wade Saucier and that the Defendant, Joel Scott Spires, acted in self-defense, then you, the jury shall find Joel Scott Spires, "Not Guilty."

¶34.   Instruction D-9A stated:

The Court instructs the jury that the Defendant, Joel Scott Spires, was entitled to act upon appearances. If the conduct of Rodney Wade Saucier was such as to induce in the mind of a reasonable person a fear that death or great bodily harm was about to be inflicted by Rodney Wade Saucier on Joel Scott Spires, situated as was the Defendant, Joel Scott Spires, under all the circumstances then existing, and viewed from the standpoint of the Defendant, Joel Scott Spires, then it does not matter if there was no such danger. If you the jury believe that the Defendant, Joel Scott Spires, acted in self-defense from the real and honest conviction that he was in danger or death or great bodily harm, then you, the jury, shall find the Defendant, Joel Scott Spires, "Not Guilty," even though you, the jury, believe that at the time Joel Scott Spires was mistaken and was not in any great danger.

¶35.   We find that these instructions "fairly covered" Spires's right to stand and fight if he

reasonably believed that he was in danger of death or great bodily harm. Thus, we hold that

13

the trial judge did not err when he refused Spires's additional "stand-your-ground" instruction.

*No Factual Basis*

¶36. We also find that Spires's "stand-your-ground" instruction is not supported in the record. After a thorough review, we find nothing in Spires's testimony that would suggest to a reasonable juror that he ever had an opportunity to retreat from the fight. In fact, Spires specifically stated that he had no opportunity to escape the fight:

> COUNSEL FOR SPIRES: Why didn't you just back off at that point and let [Saucier] go?
>
> SPIRES: Because he was swinging and hitting on me at the time. There wasn't no backing off. He wouldn't turn loose of me . . . .

¶37. Thus, we hold that the trial judge did not err when he refused Spires's "stand-your-ground" instruction.

**CONCLUSION**

¶38. Based on the foregoing analysis, we hold that, although the trial court erred in preemptively dismissing a potential juror, Spires is procedurally barred from arguing the issue on appeal. Procedural bar notwithstanding, we find that the error was harmless. We also hold that the trial court did not err when he refused Spires's "stand-your-ground" instruction. We therefore affirm the decision of the Harrison County Circuit Court.

¶39. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT PAROLE, AFFIRMED**.

**WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY.**

14

**KITCHENS, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED IN PART BY GRAVES, P.J**.

**KITCHENS, JUSTICE, CONCURRING IN RESULT ONLY:**

¶40.    I agree that the conviction should be affirmed.  But because the majority includes unnecessary analysis on both issues, I respectfully concur in result only.

¶41.    First, the majority opinion correctly concludes that by failing to lodge a contemporaneous objection to the trial judge's preemptive disqualification of a juror, Spires is procedurally barred from raising the issue on appeal.  The analysis should end there, but the opinion continues on to an unneeded "harmless-error" analysis.

¶42.    Second, the opinion finds that Spires's requested instruction was properly denied because it was fairly covered elsewhere *and* because there was no factual basis in the record to support such an instruction.  I agree that there was no factual basis for a "stand-your-ground" instruction and would conclude the inquiry there.  Moreover, I cannot agree that the "stand-your-ground" instruction was fairly covered in the other self-defense instructions, as none of them mentions or even alludes to the idea of retreat.

¶43.    For these reasons, I respectfully concur in result only.

**GRAVES, P.J., JOINS THIS OPINION IN PART.**