# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00518-COA

**RICHARD SIMMONS A/K/A RICHARD DEVANE SIMMONS**   APPELLANT

**v.**

**STATE OF MISSISSIPPI**   APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/24/2023 |
| TRIAL JUDGE: | HON. CALEB ELIAS MAY |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/24/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.   Following a jury trial, Richard Simmons was convicted of second-degree murder.  On appeal, he argues that the trial court gave an improper jury instruction regarding self-defense and that the evidence is insufficient to support the conviction.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.   On the evening of July 31, 2021, Willie Latimer stopped to talk to Justin Payton at Payton's house on Northwest Street in Philadelphia.  After talking to Payton, Latimer walked a short distance down A Avenue to where a group of people had gathered, "talking and interacting."  About fifteen to twenty minutes later, Payton heard gunshots.  Payton testified

that he witnessed a "verbal communication going back and forth" between Latimer and the shooter, but Payton could not hear what they said. The shooter "was going towards" Latimer as he was shooting, and after "about the third pop, [Latimer] fell." Payton testified that after "about the second or third shot, somebody shouted, 'No, don't shoot him no more.'" The shooter, whom Payton could not identify, then fled on foot. Payton retrieved a gun from his house for protection and ran to Latimer, who was bleeding. Payton remained with Latimer until law enforcement arrived. Payton testified that there was no gun on or near Latimer and that no one removed a gun from the area before law enforcement arrived.[1]

¶3.    Lieutenant David Brackett of the Philadelphia Police Department responded to the shooting. When he arrived, "several people [were] standing over Mr. Latimer" and "stating he had been shot." Brackett found a gunshot wound to Latimer's lower torso and applied pressure to the wound until an ambulance arrived to transport Latimer to Neshoba General Hospital. Brackett did not find a weapon on Latimer or in the area around him. Brackett estimated that when he arrived at the scene, "over 50" people were outside and in the area, but only Payton and his wife were willing to talk to him. "Nobody else would say anything or . . . knew what happened." Simmons was developed as a suspect, and officers searched the nearby woods and checked Simmons's residence and some of his relatives' homes, but they did not find him. The police searched the area around A Avenue and found three shell casings—a "flattened" .22 caliber and two 9mm casings—near the location of the shooting.

---

[1] Payton testified that he keeps his gun in a fingerprint gun safe just inside his front door, so it only "took [him] two seconds to get [his] gun out of the house," and Latimer "was still in [his] sight" at all times.

They did not recover the gun involved in the shooting.

¶4. Dr. Jessica Myers, an emergency room physician at Neshoba General Hospital, treated Latimer the night he was shot. Myers testified that Latimer had two "puncture wounds" on his abdomen and back and was in "[v]ery grave condition" when he arrived at the hospital. About an hour and a half after he arrived at the hospital, Latimer was transported to the University of Mississippi Medical Center (UMMC) in Jackson by helicopter. Myers testified that Latimer "was very critical." Even though "it was not the best circumstance to transport him," the doctors "knew that was the only thing [they] could do," so they sent him to UMMC "with a very weak pulse." Myers was asked if she knew whether Latimer "survive[d] any after that night." She testified, "I don't believe he did. I don't get confirmation always, but I don't believe he did." Myers also testified that she did not "observe anything that would have contributed to a cause of death other than [Latimer's gunshot] wounds." She testified that Latimer "essentially had passed away in [her] presence" "[m]ultiple times."

¶5. Detective Shea Elliot of the Philadelphia Police Department testified that Latimer died on the night of the shooting. Simmons turned himself in to police two days later. Elliot and Police Chief Eric Lyons interviewed Simmons, who then gave a signed, handwritten statement that was admitted into evidence at trial and stated in full as follows:

> I was hanging sitting out with my family. A guy provoked me. I left it alone. I tried to defuse the situation. He kept bothering me and kept bothering. So he kept going in my truck and putting beer bottles under my tires. I still told him I don't want no problem. So he asked me to walk with him and so I did thinking we can talk it out. But as we walked out he kept talking and flinching for his side. So now I'm scared like what's on his mind and then the second time he reaches I turned around and ran and shot once towards the ground and kept running for shelter.

3

According to Elliot, Simmons said that he threw his gun in "some bushes" near A Avenue. The police searched that area again but did not find a gun. Elliot testified that Simmons did *not* state that Latimer had attacked him or that he ever saw Latimer with a gun.

¶6.     Simmons was indicted for first-degree murder. At trial, after the State rested its case-in-chief, Simmons rested without testifying or calling any witnesses. The jury found Simmons guilty of second-degree murder, and the court sentenced him to serve thirty years in the custody of the Department of Corrections. Simmons filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

## ANALYSIS

¶7.     On appeal, Simmons argues that (1) the trial court erred by giving an improper jury instruction regarding self-defense, and (2) the State failed to present sufficient evidence of Latimer's death or cause of death.

### I.     Jury Instruction S-13

¶8.     Simmons argues that the trial court erred in giving jury instruction S-13, which stated:

> The Court instructs the Jury that one does not have the right to kill another merely because he is afraid of him; nor may one kill another because he is afraid he will receive some bodily harm. A person may not use more force than reasonably appears necessary to save his life or protect him from serious bodily harm.

At trial, defense counsel objected to S-13, stating that he had "some concern about the language." Defense counsel argued, "I think if you're afraid of any bodily harm, I do think that would . . . give you a right to defend yourself." In response, the State argued that *Hart v. State*, 637 So. 2d 1329, 1341 (Miss. 1994), *abrogated on other grounds by Taylor v. State*,

4

287 So. 3d 202, 209 (¶33) (Miss. 2020),[2] and *Griffin v. State*, 495 So. 2d 1352, 1354 (Miss. 1986), supported instruction S-13. Defense counsel then suggested that "to maybe show some distinction between serious bodily harm and mere bodily harm," the word "merely" could be inserted before "receive some bodily harm," or, alternatively, the word "some" could be italicized. Defense counsel also stated, "We would just argue that the [Mississippi] Supreme Court doesn't always get it right." The trial judge stated that he believed he could address defense counsel's concern by giving instruction S-13 before the longer, more comprehensive instruction on self-defense (S-6). Defense counsel then said "[t]hank you" and made no further objection or argument regarding instruction S-13.

¶9. Simmons's arguments on appeal are somewhat different than his objection at trial. Simmons now argues that S-13 was improper because it was "argumentative, confusing, couched in prosecutorial terms and impaired his claim of self-defense." He also argues the instruction improperly used language from an appellate opinion. "To preserve a jury instruction issue on appeal, the defendant must make a specific objection to the proposed instruction to allow the trial court to consider the issue." *Sands v. State*, 315 So. 3d 1066, 1070 (¶10) (Miss. Ct. App. 2020) (quoting *Harris v. State*, 861 So. 2d 1003, 1013 (¶18) (Miss. 2003)). "It is well-settled that 'asserting grounds for an objection on appeal that differs from the ground given for the objection at trial does not properly preserve the objection for appellate review.'" *Hearns v. State*, 313 So. 3d 533, 539 (¶18) (Miss. Ct. App.

---

[2] Another part of the *Hart* opinion approved giving what has been referred to as a "pre-arming instruction." *See Hart*, 637 So. 2d at 1336-38. That part of the *Hart* opinion was abrogated by *Taylor*, 287 So. 3d at 209 (¶33).

2021) (quoting *Montana v. State*, 822 So. 2d 954, 959 (¶12) (Miss. 2002)). Because Simmons's argument on appeal "differs from the ground given for [his] objection at trial," the issue is procedurally barred. *Id.*

¶10.    In addition, Simmons's argument is without merit. "Jury instructions are generally within the discretion of the trial court[,] and the settled standard of review is abuse of discretion." *Nelson v. State*, 284 So. 3d 711, 716 (¶18) (Miss. 2019) (quoting *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012)). "Jury instructions 'are to be read together as a whole, with no one instruction to be read alone or taken out of context. When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found.'" *Id.* (quoting *Bailey*, 78 So. 3d at 315 (¶20)).

¶11.    Here, in addition to jury instruction S-13, the court gave jury instruction S-6 without objection. Instruction S-6 stated as follows:

> The Court instructs the Jury that to make a homicide justifiable on the grounds of self-defense, the defendant must have:
> 1.    believed he was in actual, present, and urgent danger; or
> 2.    reasonably believed that Willie Junior Latimer intended to kill the defendant; or
> 3.    reasonably believed that Willie Junior Latimer intended to do great bodily harm to the defendant and the defendant reasonably believed that Willie Junior Latimer was about to carry out his actions against the defendant.
>
> The defendant does not have to prove he was acting in self-defense. The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. It is for the jury to determine the reasonableness of the ground upon which the Defendant acts.
>
> A person may not use more force than reasonably appears necessary to save his life or to protect himself from great bodily harm.

The trial court also gave jury instruction D-17, which stated as follows:

> The Court instructs the jury that you are not to judge the actions of Richard Simmons in the cool, calm light of after-developed facts, but instead you are to judge his actions in the light of the circumstances confronting Richard Simmons at the time, as you believe from the evidence that those circumstances reasonably appeared to him on that occasion; and if you believe that under those circumstances it reasonably appeared to Richard Simmons that he then and there had reasonable grounds to be fearful of some great personal injury from Willie Latimer, and there reasonably appeared to Richard Simmons to be in imminent danger of such designs being accomplished; then he was justified in using reasonable means to defend such attack, and you must find Richard Simmons not guilty.

In addition, the trial court gave D-14 that reemphasized Simmons did not have the burden to prove self-defense; rather, it was the State's "burden . . . to prove that . . . Simmons did not act in self-defense." Finally, the trial court also instructed the jury on "imperfect self-defense" manslaughter. *See id.* at (¶19).

¶12. The trial court did not abuse its discretion by giving jury instruction S-13 along with jury instructions S-6, D-14, and D-17. To begin with, the second sentence of S-13 is identical to the last sentence of S-6, which the trial court gave without objection, and the Supreme Court and this Court have approved jury instructions with this language in prior cases. *See, e.g.*, *Spires v. State*, 10 So. 3d 477, 484-85 (¶¶32, 35) (Miss. 2009); *Montana*, 822 So. 2d at 960 (¶¶17-21); *Brisco v. State*, 295 So. 3d 498, 520 (Miss. Ct. App. 2019), *cert. denied*, 293 So. 3d 834 (Miss. 2020). Accordingly, there is no error in this second sentence of S-13.

¶13. Thus, our focus narrows to instruction S-13's first sentence, which stated as follows: "The Court instructs the Jury that one does not have the right to kill another merely because

7

he is afraid of him; nor may one kill another because he is afraid he will receive some bodily harm." As the State argued at trial, this sentence is taken verbatim from the Supreme Court's opinion in *Hart*, where the Court stated "that one does not have the right to kill another merely because he is afraid of him; nor may one kill another because he is afraid that he will receive some bodily harm." *Hart*, 637 So. 2d at 1341. It is true, as Simmons notes, that the Supreme Court has "warned . . . attorneys against copying sentences from [appellate] opinions . . . into [jury] instructions." *Freeze v. Taylor*, 257 So. 2d 509, 511 (Miss. 1972). But this does not mean that it is always or invariably reversible error for a trial court to give a jury instruction that incorporates language from an appellate opinion. Language from an appellate opinion *may* not be appropriate for a jury instruction because it *may* be "abstract" or include "legalese that would confuse a jury." *Johnson v. State*, 347 So. 3d 192, 196 n.1 (Miss. Ct. App. 2021) (citing *Freeze*, 257 So. 2d at 511). But in this case, instruction S-13 is not "abstract" because it directly "relates to facts shown by the evidence on the issues involved in the case." *Freeze*, 257 So. 2d at 511. In addition, instruction S-13 is in plain language a jury can understand, not "legalese."

¶14. Moreover, as stated above, all the jury instructions given must "be read together as a whole, with no one instruction to be read alone or taken out of context." *Nelson*, 284 So. 3d at 716 (¶18) (quoting *Bailey*, 78 So. 3d at 315 (¶20)). Here, instruction S-13 was followed by instruction S-6, which informed the jury that Simmons was entitled to act in self-defense if, inter alia, Simmons "reasonably believed that . . . Latimer intended to do [him] great bodily harm . . . and . . . reasonably believed that . . . Latimer was about to carry out his

8

actions." In addition, jury instruction D-17 was similar. Read together these "instructions fairly state the law of the case and create no injustice." *Id*. Accordingly, the trial court did not abuse its discretion by giving instruction S-13. *Id*.[3]

## II.     Sufficiency of the Evidence

¶15.    Simmons also argues that the evidence was insufficient to support the conviction because the State "failed to prove beyond a reasonable doubt the fact of Latimer's death and/or the identity of Latimer's body after his death." Simmons specifically asserts that "[t]he State presented only speculative testimony and/or incompetent hearsay to suggest that Latimer died."

¶16.    For challenges to the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime." *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010) (quotation marks and emphasis omitted). "[A]ll credible evidence supporting a defendant's guilt should be accepted as true, and all favorable

---

[3] Although the trial court did not abuse its discretion by giving jury instruction S-13, the three other instructions that the court gave on self-defense (S-6, D-14, and D-17) fairly and adequately defined the concept, and we do not believe that instruction S-13 was necessary or helpful to the jury. More is not always better. *See, e.g.*, *Scott v. State*, 446 So. 2d 580, 584 (Miss. 1984) ("[T]his Court [has] cautioned district attorneys against submitting too many instructions. We now repeat that warning. An overzealous attempt to define the law often results in merely misleading and confusing the jury."); *Blanks v. State*, 542 So. 2d 222, 228 (Miss. 1989) (cautioning the State not to "request[] too many instructions defining a single concept"); *Rogers v. State*, 82 Miss. 479, 483, 34 So. 320, 321 (1903) ("The [S]tate asked [for] nine instructions, and, as is usual in such cases, falls an easy victim to too many instructions. 'The old paths are the best paths.'"); *Ingram v. State*, 62 Miss. 142, 145 (1884) ("If fewer instructions were given and greater care was observed in framing them, it would be most favorable to the interest of the State in the administration of the criminal laws."). Therefore, we caution against giving instructions like S-13 in future cases.

inferences drawn from the evidence must be reconciled in the prosecution's favor." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole*, 46 So. 3d at 293-94 (¶20). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all elements of the offense." *Williamson v. State*, 375 So. 3d 1158, 1167 (¶19) (Miss. Ct. App. 2023) (citing *Poole*, 46 So. 3d at 293-94 (¶20)).

¶17. The State has the burden to prove every element of the crime beyond a reasonable doubt. *Bowser v. State*, 182 So. 3d 425, 430 (¶11) (Miss. 2015). To prove second-degree murder, the State must show that a person was killed without the authority of law "in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual." Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2020). "The jury is allowed to draw reasonable inferences from facts based on experience and common sense." *Bowser*, 182 So. 3d at 430 (¶12) (quotation marks omitted).

¶18. The Mississippi Supreme Court has stated that "[t]he law does not require an autopsy or medical evidence to establish death. These facts are ordinarily proved by witnesses who saw the deceased after his death and who testified that the deceased was dead." *King v. State*, 251 Miss. 161, 176, 168 So. 2d 637, 643 (1964). "The criminal agency or cause of death is usually shown by witnesses who saw the homicide, or by circumstances sufficient to establish the crime to the exclusion of every other reasonable hypothesis." *Id.*

10

¶19.   Latimer's death and its cause should not have been difficult facts to prove.  But Dr. Myers, who treated Latimer in Philadelphia, testified that she did not know whether he died after he was airlifted to UMMC.  Myers could only say that she did not "believe" that Latimer survived after that night, and no doctor from UMMC testified at trial.  We assume an autopsy was performed because what appear to be autopsy photos were admitted into evidence at trial, and during Myers's cross-examination, Simmons's trial counsel stated, "I know that you did not perform the autopsy . . . ."  However, whoever performed the autopsy did not testify, nor was an autopsy report or death certificate admitted into evidence.

¶20.   Nonetheless, we conclude that there was sufficient evidence for a rational jury to find that Latimer died and that Simmons killed him.  Myers testified that Latimer "was very critical" "with a very weak pulse" when he was airlifted to UMMC.  She testified that "it was not the best circumstance to transport him, but [the doctors] knew that was the only thing [they] could do."  Myers also testified that she did not "observe anything that would have contributed to a cause of death other than [his gunshot] wounds."  In addition, Detective Elliot testified as follows:

> Q:   Did you find out he [(Latimer)] was dead?
>
> A:   I did.
>
> Q:   What was the basis of your knowledge?
>
> A:   When I called the hospital -- when I called the University to check on his condition, I was told that he had --
>
>> Defense:   Objection to continuing hearsay, what she was told.

11

Court:      Response?

Q:      Is Mr. Latimer alive today?

A:      He is not; he passed away.

Q:      Did he die on July 31, 2021?

A:      He did.

Although Simmons initially objected to Elliot's testimony, the State rephrased the question before the trial court could rule on the objection, and Elliot then answered the rephrased question without objection. Because Simmons "did not object to the rephrased question," "the issue is waived for purposes of appeal." *Keys v. State*, 33 So. 3d 1143, 1149 (¶22) (Miss. Ct. App. 2009).[4]

¶21.    Thus, the jury heard testimony that Latimer was in very critical condition when he was airlifted to UMMC, that he had no other injuries or conditions that would have contributed to his death, and that he in fact passed away later that night. Based on this evidence, a rational jury could have found that Latimer died and that he died as a result of the gunshot

---

[4] Just as in this case, the defendant in *Keys* objected to a question by the State. "Before the trial court could rule on the objection, the State rephrased the question," and the defendant "did not object to the rephrased question." *Id.* at (¶21). The Supreme Court stated, "If a defendant fails to timely object to an issue at trial, the issue is waived for purposes of appeal. The trial court will not be held in error on a matter that was never presented for its consideration. Accordingly, we find that this issue is . . . procedurally barred . . . ." *Id.* at (¶22) (citations and quotation marks omitted); *accord Parmes v. Ill. Cent. Gulf R.R.*, 440 So. 2d 261, 268 (Miss. 1983) (Following an objection, "the question was rephrased," and "[n]o objection was made to the rephrasing of this question. . . . [W]ithout having objected to the testimony at trial, appellant cannot now argue that it was error to introduce that testimony."); *Grant v. State*, 345 S.W.3d 509, 513 (Tex. App. 2011) ("When, in response to an objection, the State rephrases the question and no objection is made to the rephrased question, there is no adverse ruling to complain about on appeal.").

wounds that Simmons inflicted. Accordingly, there is sufficient evidence to support the conviction.

## CONCLUSION

¶22. The trial court did not abuse its discretion by giving jury instruction S-13, and there is sufficient evidence to sustain the conviction. Accordingly, Simmons's conviction and sentence for second-degree murder are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**