# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-KA-00526-SCT

*RACHEL L. MOORE*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 3/6/2002 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KENNETH JERMAINE GRIGSBY |
| | JAMES W. CRAIG |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFERY A. KLINGFUSS |
| DISTRICT ATTORNEY: | JOHN R. YOUNG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/13/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE SMITH, P.J., CARLSON AND GRAVES, JJ.

## GRAVES, JUSTICE, FOR THE COURT:

¶1.     This appeal arises from a jury verdict in the Circuit Court of Lee County.  Rachel L. Moore was convicted of the murder of her husband, Jason Moore, and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Aggrieved by the conviction and sentence, Rachel Moore submits five issues on appeal:

I.        Whether, in light of *Wade v. State*, the trial court committed reversible error by failing to direct a verdict in favor of Moore on the issue of murder based on the theory of "imperfect self defense."

II.       Whether the trial court erred in excluding portions of the 911 tape.

III.      Whether the trial court erred by failing to grant Moore's intoxication instruction.

IV.      Whether the jury's decision to convict the Moore of murder was against the overwhelming weight of the evidence.

V.       Whether the trial court's admittance of improper character evidence represents reversible error.

## FACTS

¶2.     Rachel and Jason Moore were married in September 2000. The marriage was marked by abusive episodes that caused Rachel Moore to leave the home on several occasions. On or about May 18, 2001, Rachel Moore drove her husband, Jason Moore, to the house of his friend Ricky Hancock. After spending some time at Hancock's house with her husband, Rachel left to take her daughter to her aunt's house. Rachel told Jason that she would return to Hancock's house to pick him up after leaving her aunt's house. After dropping her daughter off, Rachel noticed the "check engine soon" light on inside her car. She then took the car to the home of her ex-husband, Steve Walden, so that he could investigate any potential mechanical problems with her vehicle. While waiting for Walden to complete checking her vehicle, Rachel began drinking.

¶3.     After leaving Walden's residence, Rachel returned to Hancock's house to pick up her husband, however, her husband was no longer at Hancock's house. Rachel phoned her mother-in-law to inquire as to the whereabouts of her husband and was informed by her mother-in-law that Jason was at her residence, lying on the bathroom floor, passed out from intoxication. Rachel drove to her mother-in-law's home to retrieve her husband. After going into the bathroom and assisting Jason from the floor, Rachel and

2

Jason left the residence. During the trip home an argument ensued over Rachel visiting her ex-husband's home, and Jason began physically abusing Rachel, causing her to pull the car over to the side of the road. After the altercation ended, Rachel drove to Curtis Davidson's trailer, where Rachel and Jason were living at the time. Upon arriving at the trailer, Rachel told Jason "I hope you know you're fixing to die." Immediately thereafter, Jason ran into the woods beside the trailer, and Rachel went inside the trailer. Once inside, Rachel retrieved a loaded, .410 shotgun, went back outside, and fired one shot into the air. Rachel then went back inside the trailer, reloaded the shotgun, locked the door, and fell asleep. Approximately forty-five minutes later, Rachel heard Jason yelling for her to come outside and "talk." Rachel went outside and stood on the porch. While outside, Rachel pleaded for Jason to leave the premises. Jason began walking toward Rachel, and she warned him to stop. Jason said that he was sorry and that he would not hit her anymore. Rachel told Jason that she wanted him to leave, and he asked if she would take him somewhere. Rachel stated that she "wasn't taking him nowhere." Jason then asked Rachel to wake Davidson so that Davidson might take him somewhere. Rachel told Jason that she would not wake Davidson and that he should leave. Jason kept moving toward Rachel, and she continued to ask him to stop. Jason failed to stop, and Rachel fired one shot that struck Jason and ultimately led to his death.

¶4. Rachel Moore was arrested for the murder of her husband. Moore was indicted and tried in the Lee County Circuit Court. After hearing the evidence presented, the jury found Rachel Moore guilty of murder. The same day, the court sentenced Moore to life imprisonment in accordance with Miss. Code Ann. § 97-3-21 (Rev. 2000).

¶5. Moore then filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and the circuit court denied the motion. Moore then timely appealed.

## DISCUSSION

3

I.     WHETHER IN LIGHT OF *WADE v. STATE*, THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO DIRECT A VERDICT IN FAVOR OF MOORE ON THE ISSUE OF MURDER BASED ON THE THEORY OF "IMPERFECT SELF-DEFENSE."

¶6.    Moore argues that the trial court was under a duty to direct a verdict in her favor based on the theory of "imperfect self- defense" as set out in *Wade v. State*, 748 So.2d 771 (Miss. 1999). In *Wade*, the victim, Ralph Simpson, and the defendant, Deanna Wade, were joint owners of a night club, and also involved in a personal relationship which was often marked by physical abuse and violence.*Id.* at 773. In commenting on this fact, this Court noted that "Simpson had a prolonged history of violence towards Wade, especially when Wade was highly intoxicated, as he was on the night of the incident. The beatings he administered were too numerous to count...." *Id.* at 776.

¶7.    On October 6, 1996, Wade and Simpson became engaged in a severe physical altercation with each other. *Id.* at 773. The evidence at trial revealed "Simpson first beat Wade's head against a table top with enough force to knock a sign off the wall." At trial, witnesses noted that "Simpson next pulled Wade by the hair and beat her head against the edge of a pool table." After the fight ended, Wade immediately went to the house she and Simpson shared, which was located directly next door to the night club, and retrieved a .38 caliber revolver. Wade had only absented herself for a short time. Witness Coy Flanagan, in explaining how short the time frame was stated, "and then I turned him loose and I turned around and there she was." Wade remarked "you ain't gonna hit me no more" as Simpson, who was known to carry a gun in the back of his pants, continuously moved toward her. Wade fired a shot and Simpson fell to the ground, dying shortly thereafter. Wade was convicted of murder and sentenced to life in prison.

¶8.    When deciding this case, the Court of Appeals stated:

4

> While Wade was undoubtedly mad, it is also clear that her ill will was engendered by the earlier unlawful acts of Simpson and what appeared to be a renewed attack. This clearly was a killing in the heat of passion and arguably a case of imperfect self defense, and as such, manslaughter was the appropriate verdict.

*Wade v. State*, 724 So.2d 1007, 1011 (Miss. Ct. App. 1998). This Court found that the "particular facts [in *Wade*], coupled with other important facts set out [therein] relating to the prior beatings and Wade's unique situation, [were] insufficient to support a finding of malicious intent." 748 So.2d at 774.

¶9.     This Court has recognized the theory of "imperfect self-defense" whereby "an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent great bodily harm." *Id.* at 775. (citing *Lanier v. State*, 684 So.2d 93, 97 (Miss. 1996)).  Moore asserts that, in light of *Wade*, the trial court erred by failing to grant her motion for directed verdict on the issue of murder based on the theory of "imperfect self-defense" or in the alternative, a new trial.

¶10.     This Court employs the same standard of review for denials of motions for directed verdict and judgment notwithstanding the verdict and a request for peremptory instruction. *Coleman v. State*, 697 So.2d 777, 787 (Miss. 1997). Each challenges the legal sufficiency of the evidence presented at trial. *McClain v. State*, 625 So.2d 774, 778 (Miss. 1993). This Court has stated:

> Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. <u>On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgement might have reached different conclusions, affirmance is required.</u>

*Coleman*, 697 So.2d at 787-88 (emphasis added) (quoting *Sperry-New Holland v. Prestage*, 617 So.2d 248, 252 (Miss. 1993) (internal citations omitted)). *See also* **Edwards v. State**, 800 So.2d 454, 463 (Miss. 2002).

¶11. The present case is not one of "imperfect self-defense." The evidence shows that Moore picked the victim up from his mother's home, knowing that he was intoxicated and knowing of his propensity for violence when intoxicated. She then drove to Curtis Davidson's trailer, where she and the victim were living at the time. After an abusive altercation in the vehicle and upon arrival at the trailer, Moore stated to the victim "I hope you know you're fixing to die." At which time she entered the trailer and the victim ran into the woods. Moore then armed herself with a loaded, .410 shotgun, went outside and gave a "warning shot." She then reentered the trailer, reloaded the shotgun, placed extra shotgun shells in her pocket, attempted to secure the premises and waited some forty to forty-five minutes before exiting the trailer to "talk" to the victim.

¶12. During this forty-five minute interval, Moore had access to a working telephone and failed to call anyone for help. Moore failed to wake Curtis Davidson, who was sleeping in the trailer, and request that he come to her aid. Moore had the keys to her car and failed to leave the premises. In fact, according to Moore's own testimony, she "dozed off" during the forty-five minute interval.

¶13. The case at bar differs from the *Wade* case in several important aspects. First, Wade attempted to call for help prior to shooting the victim but the victim had knocked the telephone off of the wall. In the case at bar, Rachel Moore, who had access to a working telephone and had approximately forty-five minutes to call for help, failed to call anyone. Second, Wade shot the victim almost immediately after the abuse occurred. Rachel Moore shot her victim approximately forty-five minutes after the abuse occurred. Third, Wade could not leave the premises upon which the incident occurred because the victim had

6

Wade's car keys in his pocket. Rachel Moore had the keys to her car and failed to leave or even attempt to leave the premises.

¶14. When a defendant has been found guilty by a jury, appellate court authority is limited, and the verdict should not be overturned so long as there is "credible evidence in the record from which the jury could have found or reasonably inferred each element of the offense." ***Davis v. State***, 586 So.2d 817, 819 (Miss. 1991). The reviewing court is to examine all of the evidence in a light most favorable to the verdict. ***Washington v. State***, 800 So. 2d 1140, 1144 (Miss. 2001). In the case at bar, the jury was instructed on murder, manslaughter and self-defense. The question of self-defense, in conjunction with Moore's full testimony, exhibits and facts were heard and considered by the jury. The record contains credible evidence from which the jury could have found or reasonably inferred each element of the offense of murder. Therefore, the circuit court did not err in denying Moore's JNOV motion.

## II.     WHETHER THE TRIAL COURT ERRED IN EXCLUDING PORTIONS OF THE 911 TAPE.

¶15. After shooting the victim, Rachel Moore entered the trailer and woke the owner of the trailer, Curtis Davidson. Davidson got dressed and walked outside to check on the victim. After checking on the victim, Davidson told Rachel to go inside and call 911. Rachel then went back into the trailer and called 911. After a brief conversation with the 911 operator, she handed the telephone to Davidson. During his conversation with the 911 operator, Davidson repeated or commented on what Rachel Moore was doing or saying.

¶16. The trial court admitted portions of the 911 tape that contained statements made directly by Rachel Moore but excluded potions of the tape that contained the dialogue of Davidson commenting on what happened while he was asleep or repeating statements made to him by Moore.

¶17.    Moore argues that statements she made while Davidson was on the telephone with the 911 operator, which are somewhat audible in the background of the tape, should have been admitted into evidence as evidence of her state of mind just after the shooting. This argument is without merit. Certain portions of the 911 tape that were heard by the jury clearly evidence Moore's state of mind immediately following the incident. Thus, Moore was not deprived of the entire 911 tape, only those portions of the tape which contained hearsay that could not be redacted.

¶18.    Moore next argues that statements made by Davidson to the 911 operator were evidence of present sense impressions and should have been admitted as such. A present sense impression is: " a statement describing or explaining an event or condition made while the declarant <u>was perceiving the event or condition or immediately thereafter</u>." M.R.E. 803(1) (emphasis added) Davidson's statements to the 911 operator were hearsay and do not fall within the present sense exception to the rule. Davidson's statements were not made while he was perceiving the event or immediately thereafter. In fact, Davidson stated that he was asleep at the time the event took place and thus could not have described the event to the 911 operator without the aid of Moore.

¶19.    Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). Hearsay evidence is inadmissible unless it falls within one of the known exceptions. *Clark v. State*, 693 So.2d 927, 932 (Miss. 1997). Consequently, Davidson's statement to the 911 operator was hearsay since it was not uttered by the defendant. Further, Moore was not prejudiced by the excising of the 911 tape as she, as well as Davidson, were able to testify at trial.

¶20.    We find that there was no prejudice and the trial court was correct to redact and excise the 911 tape of hearsay statements made by Davidson.

8

III. WHETHER THE TRIAL COURT ERRED BY FAILING TO GRANT MOORE'S INTOXICATION INSTRUCTION.

¶21. Moore asserts that she was entitled to a diminished capacity instruction due to her intoxication. The applicable standard of review on a question of denial of a proffered instruction is: "[i]n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Holloway v. State*, 809 So.2d 598, 608 (Miss. 2002).

¶22. Moore testified that, on the night of the incident, she consumed no more than four and a half beers in a span of approximately four and a half hours. This was the only evidence put forth at trial regarding her intoxication. While the record reflects that Moore testified that she had been drinking on the night of the incident, it certainly did not appear to be part of her defense.

¶23. An accused is not entitled to an instruction based upon a defense not authorized by law, and this Court has expressly held that voluntary intoxication is not a defense to murder. *Greenlee v. State*, 725 So.2d 816, 822-23 (Miss. 1998); *O'Bryant v. State*, 530 So.2d 129, 133 (Miss. 1988).

¶24. We find that the trial court did not err by refusing to grant the diminished capacity instruction.

IV. WHETHER THE JURY'S DECISION TO CONVICT MOORE OF MURDER WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶25. Moore asserts that the overwhelming weight of the evidence strongly favors judgment notwithstanding the verdict.

¶26. "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the trial court abused its discretion in failing to grant a new trial." *Nicolaou v. State*, 612 So.2d 1080,

1083 (Miss. 1992). "Any factual disputes are properly resolved by the jury and do not mandate a new trial." *McNeal v. State*, 617 So.2d 999, 1009 (Miss. 1993).

¶27.    Looking to the record there is ample evidence to support the verdict of murder. Moore was beaten by the victim. After arriving at the trailer where they were living at the time, Moore told the victim "I hope you know you're fixing to die." She then went inside the trailer and armed herself with a .410 shotgun, which she fired once as a "warning" to the victim and fired again some forty-five minutes later fatally wounding the victim. Viewing as true the evidence which supports the jury's finding of murder, it cannot be said that the verdict was so contrary to the overwhelming weight of the evidence that allowing it to stand would constitute "an unconscionable injustice."

¶28.    We find that the trial court did not abuse its discretion in denying Moore's motion and that this argument is without merit.

V.    WHETHER THE TRIAL COURT'S ADMITTANCE OF IMPROPER CHARACTER EVIDENCE REPRESENTS REVERSIBLE ERROR.

¶29.    The victim's sister, Priscilla Moore, was allowed to testify at trial regarding Rachel Moore's demeanor at the time she picked the victim up from her mother-in-law's home. Priscilla stated that upon arriving at her mother's home Rachel stated: "Priscilla, don't f___ing start with me. I just come to pick my f___ing husband up." At another point in the trial, while discussing the driver of a nearby vehicle, Priscilla asked "'Rachel, who's that man in the truck?' And she said 'Oh forget that motherf__ker.' And I said 'You knew him?' And she said 'I ain't f___ing talking about him right now.'"

¶30.    Rachel Moore argues that the introduction of this testimony amounted to improper character evidence and should have been excluded under M.R.E. 404(a) & 404(b). "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity

10

therewith on a particular occasion...." M.R.E 404(a) "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." M.R.E. 404(b).

¶31. Priscilla Moore's testimony is not character evidence because, it is not testimony of a character trait offered to prove conformity therewith, nor is it testimony regarding "other crimes, wrongs or acts." Rachel Moore's propensity to use street vernacular in describing situations may also be heard on the 911 tape, to which the defense made no objection. Further, the statement that she gave to police investigator Steve White on the night of the incident is replete with the same type of language offered by Priscilla Moore. Specifically, in her statement to Steve White, Rachel Moore stated that just prior to shooting the victim she told him: "he wasn't nothing but a chicken f___ing coward ... come out and God d_mn pay your f___ing dues ..." This statement was heard by the jury, again with no objection offered by the defense.

¶32. We find that the testimony by Priscilla Moore was not improper character evidence and that this argument is without merit.

## CONCLUSION

¶33. Finding no reversible error, we affirm the trial court's judgment.

¶34. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB, EASLEY AND CARLSON JJ., CONCUR. McRAE, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**