IRVING, P.J.,
for the Court:
¶ 1. On March 12, 2009, Dante Lamar Evans was convicted of the murder of his father, Darold Evans. In accordance with the requirements of Mississippi Code Annotated section 97-3-21 (Rev.2006), the Harrison County Circuit Court sentenced Evans to life in the custody of the Mississippi Department of Corrections. Although Dante was fourteen years old at the time of the offense, the circuit court had no discretion in the pronouncement of sentence.
¶ 2. On March 20, 2009, Dante filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, which the circuit court denied. Feeling aggrieved, Dante appeals and argues that: (1) the circuit court erred by refusing to instruct the jury on imperfect self-defense; (2) the circuit court erred in excluding testimony regarding Dante’s father’s alleged past abuse of Dante and Dante’s mother; (3) the circuit court erred in refusing funds to hire an expert on post-traumatic stress disorder; (4) the circuit court denied Dante’s right to a fair trial and an impartial jury by improperly influencing potential jurors during voir dire and by excluding potential jurors who indicated that Dante’s age would inhibit their ability to be fair and impartial; (5) the circuit court erred in admitting Dante’s statements made to security guards; (6) the circuit court erred in admitting Dante’s statements made to Biloxi police officers; and (7) Dante’s life sentence is unconstitutional.
¶ 3. Finding no reversible error, we affirm.
FACTS
¶ 4. According to Dante’s videotaped police statement, he had witnessed his father physically abusing his wife and Dante’s mother, Juanita, on several occasions. *1059 Dante stated that he had witnessed his father hold his mother’s head underwater in a bathtub until she could not breathe. Dante told the police that his father had tried to run Dante’s mother over in a car. According to Dante, he also overheard his father threaten to kill Dante’s mother numerous times.
¶ 5. In 2006, Dante’s mother and father separated. Following the separation, Dante and his mother moved to North Carolina. Dante began associating with a gang, using drugs, and getting into trouble. Dante’s mother decided to send him to live with his father, whom she described as a “strict disciplinarian.”
¶ 6. On February 27, 2007, Dante moved from his mother’s home in North Carolina to his father’s home in Biloxi, Mississippi. According to Dante, his father’s abusive behavior continued when he moved in with his father. Within weeks of moving in with his father, Dante came to Latrice Walker Richardson, a guidance counselor at Dante’s school, and told her, ‘Well, I’ve been thinking about killing my dad.” At that point, Richardson called another counselor, Ms. Crockett,[1] to her office. Dante then complained that his father had beaten him. He explained that he did not want to be in Mississippi with his father. He wanted to go back and live with his mother. Before they could talk further, the bell rang for the end of the school day. Richardson asked Dante if he felt comfortable going home, and he stated that he did. However, the next morning, Dante returned to Crockett’s office, and Crockett called Richardson and the school’s social worker, Cassandra Jones, to her office. During the meeting, Richardson and Crockett informed Jones of the conversation that they had had with Dante the previous day. Jones explained to Dante that parents have the right to discipline their children but not to bruise them. She inquired of Dante whether his father had left bruises on him, and Dante said that he had not, although his father “might push or punch him in the chest.” Dante again expressed a desire to return to his mother’s home, but he stated that his father refused to allow him to contact his mother. Jones suggested that Dante write a letter to his mother, which he did. However, because Dante was working on the letter during class, his teacher confiscated it.[2] In the letter, Dante alleged that his father had “already put his hands on me leaving lumps and marks.” Dante further stated: “I can’t stand living down here, and you know that Daddy is acting like a straight fool!!! He already has got [sic] me thinking about committing serious murder and killing, and I mean SERIOUS! Daddy is a liar, a money[-]hungry, too[-]strict dummy.” As stated, Dante’s teacher confiscated the letter. Dante became defiant and, as a result, was written up for his behavior. Richardson and Jones contacted Dante’s father to discuss Dante’s behavior. Jones asked Dante’s father if there were any problems in the home. The father explained that he was a strict father but that he and Dante had a good relationship. He further explained that they prayed together in the mornings. During the meeting, Dante’s mother called Dante’s father’s cellular telephone. The father passed the telephone to Dante, and Dante spoke with his mother. This surprised the school officials because Dante had told them that his father would not allow him to contact his mother.
¶ 7. The following day, Richardson and Jones met with Dante again. Dante stated that when he and his father returned *1060 home, his father pushed him against their trailer and told him to leave. Richardson and Jones noticed that Dante had a small dark bruise next to his eye. Jones contacted the Department of Human Services (DHS). DHS later performed a home visit, but the record is unclear as to what DHS’s findings were.
¶ 8. In his videotaped police statement, Dante explained that two nights before the murder, he had removed his father’s handgun from a locked toolbox and began sleeping with it under his bed. Dante stated that he had kept the gun under his bed for protection from one of his father’s “outbursts.” Dante further stated that he had never handled a gun before. Dante told the police that either one or two nights before the murder, he had practiced pointing the gun at his father while his father slept. Dante pulled the trigger, but the gun did not fire. Dante told police that he “took it as a sign I’m not suppose [sic] to be doing it. But today, I tried it againOn April 13, 2007, Dante shot his sleeping father in the face.
¶ 9. Additional facts, as necessary, will be related during our discussion and analysis of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Imperfect Self-Defense Instruction

¶ 10. Dante argues that the circuit court erred by refusing his jury instruction on imperfect self-defense. Under the theory of imperfect self-defense, “an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent great bodily harm.” Moore v. State, 859 So.2d 379, 383 (¶ 9) (2003) (quoting Wade v. State, 748 So.2d 771, 775 (¶ 12) (Miss.1999)).
¶ 11. In Wade, the Mississippi Supreme Court recognized the theory of imperfect self-defense in the context of a domestic-violence case. Wade, 748 So.2d 771. Deanna Wade shot and killed her boyfriend, Ralph Simpson, after he had brutally beaten her in a bar. Id. at 773 (¶¶ 5-6). According to witness testimony, Simpson beat Wade’s head against a table top, pulled Wade by the hair, “and beat her head against the edge of a pool table.” Id. at (¶ 5). Immediately after the attack, Wade went to the house that she shared with Simpson and retrieved a gun. Id. at (¶ 6). Wade returned to the bar, and when Simpson moved toward her, she shot him. Id. Our supreme court found that Wade should have been convicted of manslaughter instead of murder based on either “heat of passion” or imperfect self-defense. Id. at 777 (¶ 19). In support of its finding, the court noted Simpson’s long history of abusive behavior toward Wade and the short lapse of time between the shooting and the most recent episode of abuse. Id. at 776 (¶ 15).
¶ 12. However, in Moore, a case which also involved domestic abuse, our supreme court found that the theory of imperfect self-defense did not apply. Moore, 859 So.2d at 383 (¶ 11). Rachel Moore’s husband, Jason Moore, had physically abused Rachel throughout their marriage. Id. at 381 (¶ 2). On the day that Rachel killed Jason, the couple had argued, and Jason had physically abused her. Id. at (¶ 3). When the altercation ended, Rachel told Jason, “I hope you know you’re fixing to die.” Id. Jason ran into the woods beside their trailer, but he returned approximately forty-five minutes later and yelled for Rachel to come outside and talk. Id. Once Rachel came outside, Jason walked toward her, and Rachel shot him. Id.
¶ 13. Our supreme court concluded that the facts in Moore were distinguishable *1061 from those in Wade. Id. at 383-84 (¶ 13). While both Wade and Moore were victims of domestic violence, the court noted that Moore waited over forty-five minutes after the abuse to shoot her husband. Id. at 384 (¶ 13). Additionally, the court noted that whereas Wade had no access to a telephone, Moore had access to a telephone and a car, and she failed to call for help or leave the premises. Id. at (¶¶ 12-13).
¶ 14. Our supreme court has stated that “[a] defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Clark v. State, 40 So.3d 531, 544 (¶ 36) (Miss.2010) (emphasis added) (quoting Spires v. State, 10 So.3d 477, 483 (¶ 28) (Miss.2009)). Dante correctly points out that a defendant is entitled to present his theory of the case even where the evidence in support of that theory is “minimal” or “meager.” See Spires, 10 So.3d at 483 (¶ 27). However, based on the facts above, Dante has failed to meet even the low evidentiary burden announced in Spires.
¶ 15. While there is evidence that Dante’s father had physically abused Dante in the past, Dante admitted in his police statement that no abuse had occurred on the night of the murder or on the days leading up to the murder. Dante also told the police that he had practiced aiming the gun at his father, while his father slept, either one or two nights before the murder. Finally, there was no evidence of a renewed attack by Dante’s father, who was asleep when Dante shot him.
¶ 16. Based on the holdings in Wade and Moore, we find that the facts of this case do not support a theory of imperfect self-defense. Therefore, the circuit court properly refused the instruction on imperfect self-defense. This issue is without merit.

2. Testimony Regarding the Father’s Prior Abuse

¶ 17. Dante argues that the circuit court erred in excluding the testimony of Terrence Russell, a neighbor who saw Dante’s father strike Dante with his fist and with a chain, and the testimony of Officer Susan Kimball, who would have testified regarding restraining orders issued against Dante’s father in 2006. Dante contends that the excluded testimony is central to his theory of imperfect self-defense. However, as stated above, Dante has failed to present a sufficient evidentiary basis in support of his theory of imperfect self-defense. Moreover, Dante killed his father in 2007. The excluded testimony concerns conduct that allegedly occurred in 2006, before Dante came to live with his father. Therefore, this issue is without merit.

3. Funds for an Expert on Post-Traumatic Stress Disorder

¶ 18. The circuit court appointed Dr. Beverly Smallwood, a psychologist, to evaluate Dante and determine whether he was competent to stand trial.[3] In her *1062 evaluation report, Dr. Smallwood stated that “over the years Dante has been irritable and has shown outbursts of anger; he has had difficulty concentrating; he has displayed aggressive behavior throughout his childhood,” and that “all of the above are symptoms of post-traumatic stress disorder.” Dr. Smallwood noted that Dante had been diagnosed with post-traumatic stress disorder (PTSD) in 2001. She gave an opinion, to a reasonable degree of psychological certainty, that:
A. At the time of the alleged crime(s) with which [Dante] is being charged, [he] was of sufficient mental capacity to distinguish between right and wrong and comprehend the nature and the quality of said act(s);
B. [Dante] is now in possession of mental faculties so as to enable [him] to comprehend the nature of the charge(s) against him and rationally aid in the conduct of his defense;
C. [Dante] is in such condition of mind and memory as to be able to recall the evidence connected with the offense(s) with which [he] is charged so as to enable [him] to advise counsel in a rational manner and to testify at the trial of their [sic] case if so called upon to do so;
D. At the time [Dante] allegedly committed the crime(s) with which he is charged, [he] did not suffer from mental disease, injury, or congenital deficiency such that because of a delusional compulsion, his will to resist committing the acts which constitute the crime(s) with which he is charged was overmastered.
According to Dante, Dr. Smallwood was not qualified to testify regarding the effects of PTSD on a person’s state of mind or behavior, so he requested funds to hire Dr. Gerald O’Brien, a PTSD expert. The circuit court denied Dante’s request. Because Dante sought O’Brien’s testimony in support of his theory of imperfect self-defense, which is not supported by the evidence, we find that this issue is also without merit.
4. Statements Made to, and Exclusion of, Potential Jurors
¶ 19. Dante argues that the circuit court erred in instructing potential jurors that they were “not to be concerned with the fact that [Dante] was only [fourteen] years of age at the time of [the murder].” Additionally, Dante asserts that the circuit court improperly excluded potential jurors who stated that Dante’s age would inhibit their ability to be fair and impartial.
¶ 20. During its examination of potential jurors, the circuit court made the following statement:
I think that it’s very obvious that at the time of this incident back two years ago, that the defendant in this case, Mr. Dante Evans, at the time was 14 years of age. Under the law of the State of Mississippi, due to the nature of the crime that is charged, that being with a *1063 weapon, that it is automatically certified to the [c]ircuit [c]ourt because of-irregardless of age. So you’re not to be concerned with the fact that he was only 14 years of age at the time of this incident.
Defense counsel objected to the circuit court’s statements, and the circuit court overruled the objection and explained:
I had some reservations about bringing up-for the [c]ourt to bring up the matter of the age of the accused, but in order to be sure that we had jurors that could be fair to the State as well in considering the age of this defendant, [I think] that they should be questioned and be actually instructed that a 14 year old is certified to the [c]ircuit [c]ourt once they are charged with ... this type of crime.
¶ 21. Dante contends that the circuit court’s statements improperly influenced the potential jurors and impaired his ability to proceed on his theory of imperfect self-defense. As stated above, the evidence does not support a theory of imperfect self-defense. Furthermore, we do not find that the circuit court’s statements to potential jurors were improper. Under Mississippi law, the circuit court has original jurisdiction over “[a]ny act attempted or committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death-” Miss.Code. Ann. § 43-21-151(l)(a) (Rev.2009). The circuit court correctly stated that because Dante was accused of murder, he could be tried as an adult in the circuit court. This issue is without merit.
¶ 22. The circuit court also asked potential jurors if they would allow Dante’s age to influence them during the course of the trial. Five potential jurors indicated that Dante’s age would influence them, and we have included excerpts from the voir dire examination of these jurors below.
BY THE COURT: Can all of you tell me that you’re going to follow the law, that you’re not going to allow the fact or the age of the defendant to enter into your deliberations during the course of this trial? Do I have anybody that’s going to allow that to influence them?
* * * *
A: Yes, sir, I [Charlotte Damiano] believe that I don’t think I could ignore the fact that he was 14.
* * * *
BY THE COURT: Is there anybody else in this group that is going to take into consideration and allow the fact of age to enter into your deliberations on the evidence in the case? Number 27? 27, are you telling the [c]ourt that if you were selected to be on this case, that you’re going to allow the age of the defendant to overweigh [sic] any evidence that you hear from the witness stand?
A: I [Stuart Sanders] would agree with the previous statement and just say I would be influenced by that.
BY THE COURT: All right. Thank you. Number 20, what is your answer to that?
A: I [Tina Mobbs] have a daughter that’s 14, so yes, I would have to take that into consideration.
BY THE COURT: Okay. Thank you, ma’am. Anybody else? Number 4, Ms. Byrd?
A: I [Marilyn Byrd] likewise think that I’m too much into the grandmother thing. I’ve got three grandchildren right in that age group, and I have a tendency to be a little lenient with them.
BY THE COURT: All right, Ms. Byrd. So in fairness to the State of Missis *1064 sippi, you feel like you probably should not sit on this case then; is that right?
A: I would feel like — I don’t think I could be as fair as I should be.
BY THE COURT: All right. Number 5, did you raise yours, Ms. Marin?
A: Yes. I [Brenda Marin] too don’t feel that I could be as objective as I might could be because of the age involved.
Defense counsel attempted to rehabilitate both Byrd and Marin.
BY DEFENSE COUNSEL: Now, Ms. Byrd? I know you had some reservations about standing in judgment on a boy 14 years old because you have some children or grandchildren at that age.
A: Yes, I do.
BY DEFENSE COUNSEL: Would you agree with me not because of your personal reservations about standing in judgment of such a young man, could you set that aside and listen to the evidence and just apply the law as you see fit? Could you set aside your personal reservations and follow the law as the Judge will direct you to do? Could you do that?
A: I will do my best.
BY DEFENSE COUNSEL: Okay. And Ms. Marin?
A: Yes.
BY DEFENSE COUNSEL: I know you were in the same position, and I ask the same-I do ask that same question because I want a fair jury, and I want somebody to sit here and hear the evidence. Obviously we have personal preferences. The State is entitled to a fair trial. But as long as you can sit there and apply the law as you see fit, could you do that?
A: Like the lady next to me, I could try. I have a very soft spot in my heart for the younger group.
The circuit court struck each of the above potential jurors for cause.
¶ 28. The Mississippi Supreme Court has stated that “a defendant does not have a vested right to any particular juror but only the right to be tried by a fair and impartial jury.” Smith v. State, 724 So.2d 280, 328 (¶ 193) (Miss.1998) (quoting Johnson v. State, 631 So.2d 185, 191 (Miss.1994)). Furthermore, the circuit court “has a duty to ensure ‘that a competent, fair and impartial jury is empaneled.’ ” Neal v. State, 15 So.3d 388, 398 (¶ 20) (Miss.2009) (quoting Tighe v. Crosthwait, 665 So.2d 1337, 1339 (Miss.1995)); see also Miss.Code Ann. § 13-5-79 (Rev. 2002) (stating that “[a]ny juror shall be excluded ... if the court [is] of [the] opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error”). Finally, a circuit court’s “determination that the jury is impartial will not be overturned by [an appellate court] absent an abuse of discretion.” Neal, 15 So.3d at 399 (¶ 20) (citation omitted).
¶ 24. The excluded jurors all stated that they would be influenced by Dante’s age and could not be totally impartial. The circuit court was statutorily bound to exclude potential jurors who stated that they could not try the case impartially. Therefore, we find no merit to this assignment of error.

5. Statements Made to Private Security Guards

¶ 25. Dante argues that his statements made to two security guards were inadmissible because they were obtained without a Miranda[4] warning. Our supreme court has held that “for private conduct to be *1065 turned into state action, there must be a clear nexus between the state or law enforcement and a private investigation.” DeLoach v. State, 722 So.2d 512, 519 (¶ 26) (Miss.1998). In DeLoach, the court held that a private security guard hired by a public-housing authority was not required to give a Miranda warning. Id. at (¶ 29). The court concluded that “[t]he mere fact that the security guards performed their duties on public or city property, or for the public’s benefit, does not make them state actors....” Id. at (¶ 28).
¶ 26. At Dante’s suppression hearing, Jeffrey Jones testified that he was employed by Asset Protection and Security Services (APSS). APSS contracted with the Federal Emergency Management Agency (FEMA) to provide security services at the FEMA trailer park where Dante and Dante’s father lived. Jeffrey testified that in addition to basic security training, he was trained to use handcuffs, batons, mace, and guns. Additionally, he received training from the United States General Services Administration (GSA) on bombs and bomb scares. Jeffrey further testified that guards who patrolled the trailer park wore uniforms and a ballistic vest and carried guns, batons, and mace.
¶ 27. When Jeffrey arrived at Dante’s father’s trailer, he drew his weapon and ordered Dante to exit the trailer and lie on the ground. Jeffrey then placed handcuffs on Dante. Dante asked Jeffrey, “What did I do?” Jeffrey answered, “Well, you know, you shot your dad. That’s what we’re being told. You know, that’s what we’re here for. Biloxi P.D. is on the way, and that’s the reason I’m restraining you.” Jeffrey then told Dante, “I’m not placing you under arrest. You’re being restrained until Biloxi [P.D.] gets here.” Jeffrey then asked Dante, “Where is the gun?” Dante replied, “I hid it under a trailer.” Jeffrey testified that he did not give Dante a Miranda warning.
¶ 28. Based on DeLoach, we find that the APSS security guards were not required to give Miranda warnings to Dante. Like the guards in DeLoach, the security guards were employed by a private security company who had contracted to provide security with a government agency, FEMA. While the APSS security guards received some government training, we do not find that such training constitutes a sufficient “nexus” to elevate the private investigation by the guards to a state action.
¶ 29. Even if the APSS security guards were found to be state actors, the public-safety exception to Miranda would apply. The United States Supreme Court has held that Miranda warnings are not required where “police officers ask questions reasonably prompted by a concern for the public safety.” New York v. Quarles, 467 U.S. 649, 656, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In Quarles, a woman approached the police and told them that she had been raped. Id. at 651. She told the police that the man had a gun and had entered a nearby supermarket. Id. at 651-52. A police officer entered the supermarket and apprehended a man who matched the woman’s description of her attacker. Id. at 652. As the officer frisked the suspect, he noticed that he was wearing an empty gun holster. Id. The officer asked the suspect where the gun was, and the suspect answered, “the gun is over there.” Id. The Quarles Court held that the suspect’s answer was admissible under the public-safety exception to Miranda. Id. at 655.
¶ 30. In this case, the APSS security guards knew that a trailer-park resident had been shot; however, when they arrived at the scene, Dante was not in possession of a gun. Additionally, Jeffrey *1066 testified that a small crowd had formed at the trailer. Even if the APSS security-guards were found to be state actors, they were entitled to ask Dante about the gun’s location under the public-safety exception to Miranda. Based on DeLoach and Quarles, we find that the circuit court properly admitted Dante’s tatements to APSS security guards. This issue is without merit.

6. Statements Made to Biloxi Police Officers

¶ 31. Dante argues that the circuit court erred in denying his motion to suppress his videotaped statement to Biloxi police officers because the statement was involuntary. Dante asserts that his age, his inexperience with law-enforcement interrogation, and the use of “coercive tactics” by the police rendered his statements inadmissible.
¶ 32. “For a confession to be admissible, it must have been given voluntarily and not given as a result of promises, threats or inducements.” Nelson v. State, 10 So.3d 898, 910 (¶ 52) (Miss.2009) (quoting Martin v. State, 871 So.2d 693, 701 (¶ 29) (Miss.2007)). “A confession is voluntary when, taking into consideration the totality of the circumstances, the statement is the product of the accused’s free and rational choice.” Wilson v. State, 936 So.2d 357, 361-62 (¶ 8) (Miss.2006) (citing Jacobs v. State, 870 So.2d 1202, 1207 (¶ 10) (Miss.2004)). “This totality-of-the-cireum-stances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved.” Dancer v. State, 721 So.2d 583, 586 (¶ 19) (1998) (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).
¶ 33. Before beginning the interrogation, Officer Kimball told Dante, “Just got off the phone with your mom, Dante, ok. She knows I’m talking to you.” Dante contends that Officer Kimball’s statement implied that his mother approved of the interrogation and wanted Dante to confess. In support of his contention, Dante cites Carley v. State, 739 So.2d 1046 (Miss.Ct.App.1999) and Murray v. Earle, 405 F.3d 278, 289 (5th Cir.2005). In Carley, this Court found that a fourteen-year-old’s confession was involuntary based, in part, on promises of religious salvation made by the police. Carley, 739 So.2d at 1053 (¶ 27). In Murray, the United States Fifth Circuit Court of Appeals found that an eleven-year-old’s confession was involuntary where “the police officers represented to [her] that they had already talked to everyone in her family, that everyone ‘knew’ what happened, and that she could help her family only by telling the truth.” Murray, 405 F.3d at 289.
¶ 34. We do not find that Officer Kimball’s statement to Dante at the beginning of the interrogation amounts to the type of overreaching and coercive tactics found in Carley and Murray. Officer Kimball simply informed Dante that she had spoken to his mother and that his mother knew that Dante was speaking to the police. Officer Kimball’s statement included no promises of leniency or reward in exchange for Dante’s confession-in fact, it did not even request a confession from Dante. Dante’s argument that Officer Kimball’s statement somehow implied that his mother wanted him to speak to the police amounts to mere speculation.
¶ 35. During the videotaped interview, Officer Kimball verbally informed Dante of his Miranda rights and gave Dante a waiver form, which Dante signed. Officer Kimball asked Dante whether he understood his rights, and he indicated that he did. There is no evidence that Dante lacked the intellectual capacity to understand his rights. Officer Kimball testified *1067 that during the interview, Dante was articulate, coherent, and was not intoxicated or under the influence of drugs. Furthermore, Officer Kimball testified that Dante was not coerced, threatened, or promised anything in exchange for his confession.
¶ 36. Dante contends that because of his age, the absence of a parent, attorney, or other friendly adult during the interrogation renders his statement involuntary. However, Dante never asked to speak to an attorney, his mother, or any other adult during the interrogation. Furthermore, our supreme court has held that in crimes where the “circuit court has original jurisdiction, ‘age ha[s] no special bearing on [a child’s] ability to be questioned without a parent and voluntarily waive his rights.’ ” Clemons v. State, 733 So.2d 266, 270 (¶ 14) (Miss.1999) (quoting Blue v. State, 674 So.2d 1184, 1205 (Miss.1996) (overruled on other grounds)). Because Dante was accused of murder, he was no longer afforded the protections of the Youth Court Act, which requires notification of a judge and the child’s parent or guardian when a child is taken into police custody. Miss.Code Ann. 43-21-303(3) (Rev.2009). Therefore, the fact that Dante was interviewed without a parent, guardian, or other friendly adult present does not render his statement inadmissible.
¶ 37. Based on the totality of the circumstances, we find that the circuit court did not err in determining that Dante’s confession was voluntary and admissible. This issue is without merit.

7. Constitutionality of Dante’s Life Sentence

¶ 38. Dante argues that his mandatory life sentence constitutes cruel and unusual punishment and is unconstitutional.[5] Under Mississippi law, “[e]very person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the State Penitentiary.” Miss. Code Ann. § 97-3-21 (Rev.2006). The statute carries a mandatory life sentence, and it does not afford the trial judge any sentencing discretion.
¶ 39. While a sentence may be subject to attack if it is “grossly disproportionate” to the crime committed, a sentence will not be subject to appellate review when it falls within the limits prescribed by statute. Johnson v. State, 950 So.2d 178, 183 (¶ 22) (Miss.2007). Furthermore, our supreme court has held that “providing punishment for crime is a function of the legislature, and, unless the punishment specified by statute constitutes cruel and unusual treatment, it will not be disturbed by the judiciary.” Id. (citing Presley v. State, 474 So.2d 612, 620 (Miss.1985)). Finally, the United States Supreme Court has held “that a sentence does not need to take into account ‘individual degrees of culpability’ to be constitutional, and Congress may ‘define criminal punishments without giving the courts any sentencing discretion.’” Edmonds v. State, 955 So.2d 864, 895 (¶ 96) (Miss.Ct.App.2006) (rev’d on other grounds by Edmonds v. State, 955 So.2d 787 (Miss.2007)) (quoting Chapman v. United States, 500 U.S. 453, 466-67, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)).
¶ 40. In Edmonds, Tyler Edmonds was convicted of the murder of Joey Fulgham and sentenced to life imprisonment. Edmonds, 955 So.2d at 790 (¶ 2). Edmonds was thirteen years old at the time of the *1068 murder. Id. at (¶ 3). Because our supreme court found that Edmonds had been denied a constitutionally fair trial, it reversed and remanded the case for a new trial, and it did not reach the issue of whether Edmonds’s life sentence was unconstitutional. Id. at (¶ 2).
¶ 41. This Court did address the issue of whether Edmonds’s life sentence was unconstitutional, and we held as follows:
The Mississippi [L]egislature has explicitly legislated that convictions for murder are intended to carry life sentences. No exception is named in the statute for a defendant of tender years. The fact that the [L]egislature has specifically written the code so as to expose a minor to prosecution in the circuit court as an adult indicates that juveniles prosecuted for grievous offenses, such as the one here, are intended to be tried and sentenced like an adult. The special exceptions and protections rendered to defendants of tender years are reserved for juveniles prosecuted in youth court. Therefore, despite the fact that no discretion is given the trial court by the statute, Edmonds’s sentence is still constitutional, and the court did not err in sentencing Edmonds to life. Indeed, any other sentence would have constituted error on the part of the court, since it had no discretion to impose a different sentence.
Edmonds, 955 So.2d at 895 (¶¶ 97-98).
¶ 42. Despite this Court’s holding in Edmonds, Dante argues that the recent United States Supreme Court decision in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) supports his argument that his life sentence is unconstitutional. However, Graham is distinguishable from Dante’s case. In Graham, the Court held that juvenile offenders could not be sentenced to life imprisonment for nonhomicide crimes. Id. at 2034. The Court did not expressly address the constitutionality of imposing life sentences on juveniles who commit murder. However, the Court did draw a distinction between murder and other violent crimes:
The Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. There is a line between homicide and other serious violent offenses against the individual. Serious nonho-micide crimes may be devastating in their harm but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared to murder in their severity and irrevocability. This is because life is over for the victim of the murderer, but for the victim of even a very serious nonhomicide crime, life is not over and normally is not beyond repair.
Id. at 2027 (internal quotations and citations omitted).
¶ 43. The Graham Court refused to extend its holding beyond the context of juveniles who commit nonhomicide crimes. Additionally, the Court expressly stated that murder was distinguishable from other violent crimes. Given the existing precedent and state law, we find no basis for extending the holding in Graham to juveniles who commit murder. This issue is without merit.
¶ 44. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
*1069 LEE, C.J., GRIFFIS, P.J., MYERS, ROBERTS, AND MAXWELL, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE OPINION JOINED BY BARNES AND ISHEE, JJ. RUSSELL, J., NOT PARTICIPATING.

. Crockett's first name does not appear in the record.

. The letter was not introduced into evidence, only marked for identification.

. Specifically, Dr. Smallwood was asked to determine the following:
A. Whether the Defendant, at the time of the alleged crime(s) with which the Defendant is being charged, was of sufficient mental capacity to distinguish between right and wrong and comprehend the nature and the quality of said act(s);
B. Whether the Defendant is now in possession of mental faculties so as to enable [the] Defendant to comprehend the nature of the *1062 charge(s) against him and rationally aid in the conduct of his defense;
C. Whether the Defendant is in such condition of mind and memory as to be able to recall the evidence connected with the offense(s) with which [the] Defendant is charged so as to enable [the] Defendant to advise counsel in a rational manner and to testify at the trial of their [sic] case if so called upon to do so;
D. Whether at the time [the] Defendant allegedly committed the crime(s) with which he is charged, said Defendant suffered from mental disease, injury, or congenital deficiency such that because of a delusional compulsion, his will to resist committing the acts which constitute the crime(s) with which he is charged was overmastered.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” The Mississippi Constitution contains a similar prohibition: "Cruel or unusual punishment shall not be inflicted, nor excessive fines be imposed.” Miss. Const. art. 3, § 28.