# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00617-SCT

*ADAM L. MILLS a/k/a ADAM LARRY MILLS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/27/2022 |
| TRIAL JUDGE: | HON. DAL WILLIAMSON |
| TRIAL COURT ATTORNEYS: | PATRICK LANCE PACIFIC |
| | MATTHEW CHISOLM SHERMAN |
| | DENNIS LEE BISNETTE |
| | ANTHONY J. BUCKLEY |
| | KRISTEN E. MARTIN |
| | KATHERINE BISNETTE SUMRALL |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| |     MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/14/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. Adam Mills brutally killed his girlfriend while apparently under the influence of drugs; she was stabbed more times than the medical examiner could count, and her abdomen was cut so severely that a first responder repeatedly exclaimed she had been "cut in half." Mills was convicted of first-degree murder and sentenced to serve life in prison. He now

appeals, arguing that he could not be convicted of first-degree murder because the weight of the evidence did not support a finding that he had the requisite mental capacity to form a premeditated intent to kill. Mills also contends the trial court erred by admitting photographs and body camera footage from the scene of the crime. We find no error and affirm.

**FACTS**

¶2.     On June 4, 2020, around 2:15 in the morning, Ashley Pearson called John Michael Dearman and asked him to come to the home that she shared with Adam Mills. She told Dearman that Mills was "freaking out," and she asked him to come over to help with the situation. Dearman arrived roughly fifteen minutes later. He later testified he had believed he was being asked to come over to help "calm [Mills] down before he took off in the truck and possibly got himself in trouble . . . with the law."

¶3.     When Dearman arrived, Mills and Pearson met him outside. According to Dearman, Mills seemed "pretty normal" but "a little erratic."   Mills said he wanted to go pick up his son, and he was apologizing to Pearson for cheating on her. Pearson was crying. Dearman consoled Pearson, and the three went inside the home. Once inside, Mills continued to apologize to Pearson, and she told him it was "fine."

¶4.     For a moment, "everything seemed fine," but, according to Dearman, Mills then began "swatting at something that [Pearson and Dearman] could not see." Mills acted as if he "was fighting something [they] could not see, like physically fighting something," and he appeared to be "losing." Mills then picked up a knife and "was . . . trying to fight off . . . whatever he saw." He then dropped to his knees, slumped over, stood back up, and pressed the knife

2

against the back of his own neck. Pearson tried to take the knife from Mills, who turned his head towards her and frightened her. Pearson "jumped like a foot in the air and screamed and took off running towards the laundry room." Mills ran after her, and they left Dearman's sight. Dearman then heard what sounded like a "tussle." He then left the home, taking Mills's keys and locking the front door behind him. Once Dearman reached his car, he called 911 to request an "evaluation" of Mills. Dearman was told someone was on the way, and he left.

¶5. Around 2:50 a.m., Deputy Chase Smith responded to a dispatch for a possible suicidal male, Adam Mills. He was joined by Sergeant Brennon Chancellor and Deputy Michael Thomas. Deputy Smith was wearing a body camera that captured footage of the night.

¶6. When Smith arrived on the scene, he found Adam Mills outside of his home, pacing back and forth, naked and covered in blood. When Mills saw the officers, he started yelling obscenities and charged toward them. Sergeant Chancellor then fired three rounds of a nonlethal shotgun, and Deputy Smith deployed his taser, taking Mills to the ground. Once Mills was subdued, medical personnel began to tend to him. The officers, unaware there had been a second person at the scene, took some time before entering Mills's home to "clear" it.

¶7. When they went in, the officers found blood was splattered and smeared throughout the house. Furniture had been knocked over and fixtures broken. Deputy Smith discovered Ashley Pearson's body in a pool of blood in the laundry room. Deputy Smith then went to monitor Mills, who was put into an ambulance.

3

¶8.     Around 3:00 a.m., Deputy Steven Graeser arrived at the scene and took photographs. The photographs and Deputy Smith's body camera recording were introduced into evidence at trial over Mills's objection.

¶9.     A toxicologist from the Mississippi Forensics Laboratory testified that blood drawn from Mills tested positive for amphetamine (Adderall or pseudoephedrine), methamphetamine, benzodiazepines (midazolam—a sedative used in hospitals), benzoylecgonine (a metabolite for cocaine), and cannabinoids. The toxicologist did not measure the blood level of the substances, nor could he say when they were ingested.

¶10.    Jamie Bush, also employed by the Mississippi Forensics Laboratory, testified that prints from a bare foot, made in what appeared to be blood and found at the scene, belonged to Mills.

¶11.    Finally, Dr. Mark Levaughn, a medical examiner, testified as a forensic pathologist. He reviewed the records from the victim's autopsy and testified as to her injuries and cause of death. Pearson had extensive bruising on her face and body, which Dr. Levaughn described as the result of a "beating." Pearson also had numerous stab and slash-type injuries over much of her body, including the face and neck. There were so many stab wounds to Pearson's upper left chest that they could not be counted. She also had a massive slash wound across her abdomen that exposed her abdominal cavity and organs, as well as many lesser slash wounds to the abdomen. Pearson also had numerous defense wounds on her hands. Dr. Levaughn believed the wounds were caused by a single-edged knife. He

4

determined that Pearson had bled to death and that it would have taken some time for her to die.

## DISCUSSION

### 1.    Admissibility of Photographs and Dash Camera Footage

¶12.    Mills contends that the trial court erred by admitting into evidence several of the State's exhibits. These include a body camera recording showing Mills's apprehension and the initial police entry into his home, photographs of the scene where Pearson's body was found, and one photograph showing Pearson's wounds after her body had been cleaned.

¶13.    Mills challenged the admissibility of these exhibits under Mississippi Rule of Evidence 403, which states that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  MRE 403.

¶14.    This Court has explained:

> "[T]he admissibility of photographs rests within the sound discretion of the trial court."  "The decision of the trial judge will be upheld unless there has been an abuse of discretion, which is a standard very difficult to meet."  The admission of photos of a deceased is within the sound discretion and is proper so long as the photos serve some useful, evidentiary purpose.  "Photographs that aid in describing the circumstances of the killing, the location of the body and cause of death, or that supplement or clarify a witness's testimony have evidentiary value and are admissible before a jury."

*Ambrose v. State*, 254 So. 3d 77, 135 (Miss. 2018) (alteration in original) (citations omitted).

¶15.    "The discretion of a trial judge to admit photos in criminal cases[] runs toward almost unlimited admissibility regardless of gruesomeness, repetitiveness, and the extenuation of

5

probative value." *Id.* (internal quotation marks omitted) (quoting *Bennett v. State*, 933 So. 2d 930, 946 (Miss. 2006)). "The trial judge's discretion is nearly unlimited, no matter the gruesomeness or extent of probative value." *Id.* (internal quotation marks omitted) (quoting *King v. State*, 83 So. 3d 376, 378 (Miss. 2012)).

¶16. The trial judge thoughtfully explained his reasons for admitting the video and the photographs. Regarding the photographs of the scene and the body camera video:

> The crime of first-degree murder is the killing of a human being when done with deliberate design to effect the death of the person killed. Second-degree murder is the killing of a human being when done in the commission of an act eminently dangerous to others and evincing a depraved heart regardless of human life although without premeditated design to effect the death of a particular person.
>
> I've already heard the defense posit the position that the State would not be able to prove deliberate design. If the Court gives an instruction at the end of this case that allows them to consider the lesser crime of second-degree murder, the jury would have to determine whether the commission of this crime was done in a way that evinced a depraved heart regardless of human life. If there is—if the Court is asked for a manslaughter instruction at the end, manslaughter is defined as the killing of a human being without malice in the heat of passion but in a cruel or unusual manner or by the use of a dangerous weapon. The manner in which this lady died is very relevant and the manner in which the killing, if so—if such, the manner in which it was done is the key thing that the jury has to decide and the wounds or the extent of the wounds or the circumstances of the scene. . . . I don't know how else the State can prove that but to show the scene, the type of wounds, the extent of the wounds to try to convey to the jury the way in which this lady died and the manner in which her death was brought about. . . .
>
> [T]hey've got to look at Mr. Mills, his demeanor and the manner in which his actions were that night at the time they arrived. They've got to look at the scene. They've got to look at the type of wounds, the number of wounds to try to figure out what verdict to reach in this case. . . . So I realize they may be—they may be hard to look at, yet in this case these are the very issues the jury has to figure out, has to decide upon. And they're going to get to see the scene and to try to determine those things. So the objection is overruled.

6

Regarding the photograph of the cleaned body of the victim from the autopsy:

> This photo that was made at the time of the autopsy is much more of a close-up photograph of any of the photographs viewed at this point. The Court in one of the other photographs could tell there was some wound to the abdomen, but this photograph also shows a wound to the upper chest area above her left breast. There appears to be some kind of wound across her throat. There also is an extensive wound across her abdomen. And the length of the wound—the extent of the wound is shown much more clearly here than in any of the photographs that we've seen. There also appear to be on her right hand some defensive wounds. There are slashes to her right hand, on the top of the hand, on top of the index finger in the area of the knuckle, on the top of her right hand and another cut on the top of the thumb that could be viewed as consistent with defensive wounds. There are other smaller lacerations and bruises in other places.
>
> But just like the Court has mentioned in response to previous objections, the jury has to figure out . . . the state of mind of the defendant at the time that the wounds were done. This is not one single wound. This multiple, many wounds. And the jury has to decide . . . whether this is deliberate design . . . .
>
> I find that the photograph does have probative value to try to help the jury make [that] determination, and its probative value is not outweighed by the prejudicial effect; that is, the manner in which this was done[—]the state of mind of the defendant[—]is at the very heart of this case.

¶17. We agree with the circuit court's analysis. There were no witnesses to the killing, so the jury had to rely on circumstantial evidence to determine Mills's intent or lack thereof. The only evidence of what was in Mills's mind when he committed the crime was what can be inferred from what he saw and did, and the best evidence of that was photographs and video recordings from the scene. This was a gruesome crime, but the photographs and dash camera footage were no more gruesome than they had to be to show the jury what had happened. We find no abuse of discretion in the decisions to admit the video and the photographs.

7

## 2. Weight of the Evidence

¶18. In his remaining issue, Mills contends that his conviction for first-degree murder was against the overwhelming weight of the evidence—because, he argues, the evidence established that Mills "did not have the mental capacity to form an intent to kill when he attacked Pearson."

¶19. Mills acknowledges that this Court has repeatedly held that "*voluntary* intoxication is not a defense to a specific-intent crime." *Anderson v. State*, 361 So. 3d 609, 620 (Miss. 2023) (internal quotation marks omitted) (quoting *Hutto v. State*, 227 So. 3d 963, 987 (Miss. 2006)). "[A] defendant's voluntary intoxication is not a defense to murder." *Abeyta v. State*, 137 So. 3d 305, 312 (Miss. 2014) (citing *Moore v. State*, 859 So. 2d 379, 385 (Miss. 2003)).

> The rule is that "[i]f a defendant, when sober, is capable of distinguishing between right and wrong, and the defendant voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated and commits an offense while in that condition, he is criminally responsible for such acts."

*Id.* (alteration in original) (quoting *Greenlee v. State*, 725 So. 2d 816, 823 (Miss. 1998)). In *Abeyta*, this Court expressly held that "Abeyta's voluntary ingestion of drugs and alcohol did not negate the element of deliberate design." *Id.*

¶20. Mills acknowledges those authorities, but he cites *Lee v. State,* 403 So. 2d 132, 134 (Miss. 1981), which had held that "voluntary intoxication is not a substitute for intent" and that "intent is a requisite ingredient of the offense."

¶21. *Lee* is a 1981 decision and, to the extent it has been contradicted by later decisions, it has been overruled. In *Smith v. State*, 445 So. 2d 227, 231 (Miss. 1984), this Court

8

juxtaposed *Lee* with the earlier decision in *McDaniel v. State*, 356 So. 2d 1151 (Miss. 1978), which had overruled all prior decisions permitting a defendant to negate specific intent by voluntary intoxication. The Court then expressly reaffirmed *McDaniel*:

> The *McDaniel* court did not limit the question of voluntary intoxication to instructions either for the State or the accused. The rule is simply and clearly stated therein and means that, if a person, when sober, is capable of distinguishing right and wrong and voluntarily intoxicates or drugs himself to the extent that he does not know or understand his actions, e.g., steals, robs, or murders, he is responsible and he may be convicted and sentenced for the crime.
>
> In order that there may be no misunderstanding among the bench and the bar, we reaffirm *McDaniel*[.]

*Smith*, 445 So. 2d at 231.

¶22. Justice Hawkins, the author of *Lee*, acknowledged its abrogation in dissent from the 1985 decision in *Cummings v. State*, 465 So. 2d 993, 998 (Miss. 1985) (Hawkins, J., dissenting). Justice Hawkins wrote that *Lee* had "endeavored to pull in the horns" of the 1978 decision in *McDaniel*. *Cummings*, 465 So. 2d at 998. But, in *Cummings*, the horns had been "extended to their original *McDaniel* length . . . where the majority is content to let them remain." *Id.* Thus, *Lee* has been overruled to the extent it held that a defendant may call into question his capacity to commit a specific intent crime by appeal to his voluntary intoxication.

¶23. The jury could infer Mills intended to kill Pearson from his use of a knife, a deadly weapon. *See, e.g.*, *Anderson*, 361 So. 3d at 617. Even if that were not enough, Pearson's injuries bespeak an unmistakable deliberate design to kill—nearly all of Mills's stabs and slashes were directed at vital organs: Pearson's throat was slashed, she was stabbed

9

repeatedly in the upper left chest (damaging the heart, lungs, and aorta), and her abdomen was cut open across its entire front, spilling her entrails and organs. The evidence that Mills committed first-degree murder was overwhelming.

## CONCLUSION

¶24.    The trial court did not abuse its discretion by admitting the photographs or the body camera video, and Mills's conviction of first-degree murder was not against the overwhelming weight of the evidence.  We therefore affirm Mills's conviction and sentence.

¶25.    **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR.**